```
             UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF NEW YORK



----------------------------X
                            :
VYTAUTAS VEBELIUNAS,        :
                            :    99-CV-2328 (CBA)
            Plaintiff,      :
                            :    September 13, 2000
                            :
         V.                 :    Brooklyn, New York
                            :
UNITED STATES OF AMERICA,   :
                            :
            Defendant.      :
----------------------------X


        TRANSCRIPT OF CIVIL CAUSE FOR CONFERENCE
         BEFORE THE HONORABLE CAROL B. AMON
              UNITED STATES DISTRICT JUDGE


APPEARANCES:

For the Plaintiff:         VYTAUTAS VEBELIUNAS, PRO SE



For the Defendant:         GORDON MEHLER, ESQ.
                           THOMAS McFARLAND, ESQ.



Audio Operator:            BRIAN KETCHAM


Court Transcriber:         ARIA SERVICES, INC.
                           c/o Elizabeth Barron
                           102 Sparrow Ridge Road
                           Carmel, NY 10512
                           (845) 260-1377



Proceedings recorded by electronic sound recording,
transcript produced by transcription service
```

1          THE CLERK:  Vebeliunas versus United States

2   of America.

3          Note your appearances for the record.

4          MR. MEHLER:  Gordon Mehler and Tom McFarland

5   for the government.

6          MR. VEBELIUNAS:  Vytautas Vebeliunas, pro

7   se.

8          THE COURT:  Basically, I had set this down

9   -- I had issued a memorandum and order.  In that

10  memorandum and order -- that was pursuant to the

11  petitioner's request for relief under 2255.  I denied

12  that relief but I did direct the Probation Department,

13  since I guess it's obviously a condition of Mr.

14  Vebeliunas's supervised release that he make the

15  requisite payments, that they provide me with whatever

16  information they had to the status of the restitution

17  payments and to look into the claim that the NCUA was

18  compensated for the losses.  I got a report from them.

19          But, Mr. Mehler, I had understood someone

20  from Probation would obviously be here with respect to

21  this application.

22          MR. MEHLER:  Well, your Honor, I really

23  learned about it only through the Court's order.  I

24  didn't receive Mr. Vebeliunas's papers because I guess

25  he sent them to Brooklyn again instead of to

1  Washington.  But I did speak to Ms. Divine (ph) and she

2  in fact faxed me the papers, which I read this morning.

3  She indicated to me that she was going to be out of the

4  country.

5          THE COURT:  Did she understand, though, that

6  she should have been here for this proceeding?

7          MR. MEHLER:  I don't know what the -- I

8  didn't have any discussion with her on that matter.

9          THE COURT:  Whether he is complying with the

10  conditions of supervised release is basically the issue

11  that gives me the basis to bring people in at this

12  point to discuss this.

13          MR. MEHLER:  Sure.  I can tell you what she

14  wrote to me.  I'm sure it's not confidential.  When she

15  faxed me Mr. Vebeliunas's papers, to sort of bring me

16  up to date, she said Mr. Vebeliunas is still saying

17  that the $800,000 should be credited toward

18  restitution.  The hearing is set for 9/13.  I will be

19  out of the country and will not be at the hearing.

20  Note his recent memo makes reference to travel

21  restrictions.  I got his case in April of this year and

22  since then he has not been denied any request to travel

23  for business.  I even allowed him an overnight trip to

24  see his son in New Jersey.

25          He signed attached payment agreement, which

1  he did fax to me, saying he'd pay $500 a month

2  restitution as of July, 2000.  He paid on 7/11 and 9/6

3  but skipped August.  If he's too poor to pay

4  restitution, then no travel for pleasure.  He obviously

5  can't afford it.  Some of the expenses he reports are

6  unnecessary anyhow, including $600 for "Easter"

7  expenses in April and $1,000 as a wedding gift to a son

8  in May, $750 for office help in June, $491 for office

9  help in July, which should be business expenses.  I

10  believe that's her memo to me.

11             THE COURT:  Was that memo given to Mr.

12  Vebeliunas?

13             MR. MEHLER:  I read it but I'll be happy to

14  give him a copy of it if he wants it.

15             THE COURT:  Mr. Vebeliunas, have you made an

16  arrangement with the probation officer to pay the

17  outstanding restitution?

18             MR. VEBELIUNAS:  Your Honor, she directed me

19  to pay $500 a month, so I pay that for July and I paid

20  it also for August, but I guess it arrived in

21  September.  She also agreed that if I can show that

22  there are no funds to pay, then I have to prove that

23  and I don't have to pay that.  The issue between Ms.

24  Divine, who is the probation officer, and myself is

25  that she is counting my Social Security as part of the

1    restitution.

2                    THE COURT:  You mean as part of your income.

3                    MR. VEBELIUNAS:  As part of my income.  I

4    was under the impression that Social Security was not

5    subject for payment.  At this time, by paying the $500,

6    I usually run deficit, where my son then subsidized me,

7    and of course that all goes from my Social Security

8    because my gross income is only $400 a week, which out

9    of that I have to still keep the office going.  So I

10   would like if your Honor could advise if my Social

11   Security really is subject to this restitution payment

12   or not.

13                   THE COURT:  Does the government have a

14   position?  I don't know why it wouldn't be but I don't

15   know the answer.

16                   MR. McFARLAND:  Your Honor, we are forbidden

17   by law from trying to execute on Social Security

18   benefits and public assistance and other types of

19   benefits.

20                   THE COURT:  Right.

21                   MR. McFARLAND:  However, in figuring out

22   what somebody can afford to pay, any income, public

23   assistance, Social Security, stocks, bonds, dividends,

24   that sort of thing --

25                   THE COURT:  What is your position in this

case now?  You have the case?

MR. McFARLAND:  I'm the collection man for this.

THE COURT:  For the restitution order?

MR. McFARLAND:  Yes, for the U.S. attorney's --

THE COURT:  Did you have some part in this $500 determination?

MR. McFARLAND:  We were not privy to that. Very often the Probation Department will make such agreements and unless we have serious objections, which we did not in this case, and people comply with the payment plan, then that's fine with us.  The $500 a month was acceptable under the circumstances, from my office's standpoint.

THE COURT:  I take it you are paying the $500 a month.

MR. VEBELIUNAS:  Yes, I am paying that but that gets me into deficit and I have to ask my family to support it.  That exhausts all my Social Security check plus my son has to subsidize me.

THE COURT:  What is the situation -- Mr. McFarland, you can advise the Court on this.  There are several different financial obligations that Mr. Vebeliunas has as a result of the judgment.  One is the

1    fine.

2              MR. McFARLAND:   That's right.

3              THE COURT:   And the other is the restitution

4    and the special assessment.   In what order does the

5    government collect those?

6              MR. McFARLAND:   The statute requires that it

7    be the special assessment, then restitution, then fine.

8    So the fine is in the back and as far as I know, the

9    special assessment has been satisfied.   Any payments

10   that we receive are being applied to the restitution

11   judgment and will be forwarded on to the victims by the

12   Justice Department.

13             THE COURT:   So at this point in time the

14   special assessment has been satisfied.

15             MR. McFARLAND:   To the best of my knowledge,

16   yes.

17             THE COURT:   And you're collecting payments

18   against the restitution order.

19             MR. McFARLAND:   The restitution, right.

20             THE COURT:   How long do you do that?   I take

21   it your jurisdiction isn't limited to the period of

22   supervised release.

23             MR. McFARLAND:   That's correct, your Honor.

24   The judgment is good for twenty years and it may be

25   renewed for another twenty years, if that seems

1   appropriate.

2           THE COURT:  This is in terms of collecting

3   on the restitution order.

4           MR. McFARLAND:  That's correct.

5           THE COURT:  One issue that was raised -- Mr.

6   Mehler, maybe you're the best person to answer this.

7   It was never particularly crystal clear to me.  What

8   Mr. Vebeliunas contends is that the restitution order

9   has in effect been satisfied.  The restitution order in

10  this case was a very specific restitution order.  It

11  pertained to the Club Regency and indeed it pertained

12  to several loans in connection with the Club Regency.

13  It was like $450.000.  Then there was $124,000 --

14  actually, the restitution order wasn't just Club

15  Regency.  It was also a different loan.

16          MR. McFARLAND:  WTI.

17          THE COURT:  I think we can agree that the

18  WTI had nothing to do with the bankruptcy; is that

19  correct?

20          MR. MEHLER:  I think that's right.  The Club

21  Regency involved eight separate loans and the other one

22  was a --

23          THE COURT:  Mr. Vebeliunas, I take it you

24  agree to that.  Your statement here has been that the

25  $800,000 settlement agreement in the bankruptcy -- that

1  pertained to Club Regency, correct?

2         MR. VEBELIUNAS:  Yes, your Honor.

3         THE COURT:  That did not pertain to the WTI,

4  the other --

5         MR. VEBELIUNAS:  That's correct.  I'd just

6  like to comment on the probation officer's report which

7  I just got now.  I did not tell her that the $800,000

8  should be credited against it.  My position was that

9  the entire mortgage, which was good, should have been

10  credited to the restitution because the government

11  presented that there was no mortgage or mortgage was

12  worthless, while six years after that I didn't know

13  what (ui) had, but I knew that the mortgage was good

14  and was so stated under oath by NCUA.  Your Honor

15  yourself said that it's not the amount of collection

16  but the amount of good collateral should be applied

17  against the losses.

18         THE COURT:  I take it, Mr. Mehler, you don't

19  argue with the position that the government can't

20  recover twice for the same amount.  The question is

21  whether -- it was the bankruptcy of Lidas (ph),

22  correct?

23         MR. MEHLER:  Lidas.

24         THE COURT:  In the bankruptcy proceeding,

25  based I guess on a mortgage, the government recovered

1  or NCUA recovered $800,000.

2          MR. MEHLER:  I don't believe that's

3  completely accurate.  As I understand the papers here,

4  this was an adversary action commenced for a number of

5  things, not just limited to what we're talking about,

6  all sorts of claims that the NCUA had for over two

7  million dollars.  They settled it, it's true, for

8  $800,000.  But similar to what happened when Mr. Stolz

9  stood here at the sentencing, there was a compromise,

10  there was a settlement.

11          The issues that we're dealing with here were

12  never litigated and they weren't litigated because Mr.

13  Vebeliunas and his lawyer at the time made a tactical

14  decision that in order to get a better sentence and

15  avoid protracted proceedings on extremely complicated

16  financial matters, that one point would be deducted

17  from the guidelines --

18          THE COURT:  Mr. Mehler, I'm not going back

19  to the original sentence or anything that has been

20  addressed with respect to the 2255.  I'm persuaded that

21  at the time the sentence was accurate based on the

22  information before the Court.  The only question that I

23  have now is whether, because of subsequent proceedings,

24  a restitution order that this Court entered -- the

25  Court entered a specific restitution order with respect

1  to very specific loans because you have to do that.  In

2  other words, it has to be based on the count of

3  conviction.

4            MR. MEHLER:  Right.

5            THE COURT:  So the only question is, apart

6  from what happened in the past, that is the only

7  restitution that the defendant or petitioner, if you

8  will, was required to pay by this Court.

9            MR. MEHLER:  Right.

10           THE COURT:  If for whatever reason that

11  restitution order, in other words the money that was

12  owed on those particular loans has been paid, then I

13  think that may be an issue going forward as to whether

14  now Mr. Vebeliunas should still have to pay that

15  restitution order, if in fact it was paid in another

16  manner.  That seems to be the only issue that I'm

17  interested in addressing now.  I have ruled on the

18  other issues and I'm not -- I didn't make any finding

19  that someone wasn't candid at the time.

20           Obviously, there was back and forth on the

21  sentencing, as you pointed out.  There was a certain

22  compromise in terms of not proceeding with a Fatico

23  hearing, et cetera.  That's not my concern.  I'm not

24  going back.  We're not redoing history.  However, if

25  there is a restitution order that is outstanding

1   against Mr. Vebeliunas that has in fact been paid in

2   some format, I think that is something, in terms of the

3   conditions of his supervised release, et cetera, that

4   has to be dealt with.

5           The only information I have that anything

6   has been paid that Mr. Vebeliunas has put before this

7   Court deals with his bankruptcy.  One thing that

8   appears apparent to me is this bankruptcy did not deal

9   at all with that portion of the Court's restitution

10  order that dealt with the WTI loan.  In other words,

11  that was not address.  So nothing has been raised to

12  suggest that that portion of the Court's order, which I

13  think was $90,364, is at issue.

14          MR. MEHLER:  Right.

15          THE COURT:  So as I understand it, that

16  bankruptcy doesn't raise that issue.  The other issue

17  is $124,000 was paid to the Cumus (ph) Mutual Insurance

18  Company.

19          MR. MEHLER:  I think that's a little bit of

20  a diversion because this is just the way the money was

21  split.  The total restitution was $581,000 and I think

22  that's the figure we should focus on and then subtract

23  $90,000.  The way that money is divided is --

24          THE COURT:  It depends on whether that's a

25  loss that's never been compensated.

1        MR. MEHLER:  You mean because it goes to an

2    insurance company as opposed to the NCUA.

3        THE COURT:  Right, so that may be an issue.

4    The question is if the NCUA has already been paid for a

5    substantial portion of this, then that's something that

6    I think it probably at this point may be legitimate to

7    talk about in terms of what the ultimate restitution

8    order is.  I'm not sure how it affects Mr. Vebeliunas's

9    $500 payments because under any stretch, he's still

10   liable for $90,000 and there's a $60,000 fine.  So

11   there's still a lot of money that in my view is

12   uncontested.

13        MR. MEHLER:  To say nothing of the $124,000

14   that goes to this insurance company.

15        THE COURT:  I think so but I'm not real

16   sure.  Somebody would have to point that out.

17        MR. McFARLAND:  One thing about the

18   adversary, as I understand, your Honor -- I have not

19   seen the complaint but my understanding from speaking

20   to the NCUA is that it covered a much larger universe -

21   -

22        THE COURT:  But nobody has told me that.  I

23   don't know that.  Would it be helpful for somebody

24   maybe to explain that to me?

25        MR. VEBELIUNAS:  May I, your Honor?

```
 1              MR. MEHLER:  Your Honor, the difficulty is

 2   this.  You asked a question before, which is does the

 3   government take the position that somebody should have

 4   to pay restitution twice?  I think as a matter of

 5   equity, as a matter of fairness, apart from all the

 6   legalisms --

 7              THE COURT:  I hope the answer to this is no.

 8              MR. MEHLER:  Is no, fine.  However, Judge,

 9   that doesn't end the matter because the problem here is

10   and has always been that it is murky and it is

11   difficult to know, even after communicating with the

12   NCUA people, exactly what happened.  For example, Mr.

13   Vebeliunas hinges a lot of his arguments on a

14   contradiction between Mr. Julian Friedman, who

15   testified that the collateral was worthless, and

16   another lawyer named John Consenz (ph), who said in an

17   affidavit that the mortgages were not worthless.

18              THE COURT:  But what happened in the

19   bankruptcy?  Did they recover that money because the

20   mortgages turned out to be good?

21              MR. MEHLER:  No.  As I understand it --

22              THE COURT:  Where did the $800,000 come

23   from?

24              MR. MEHLER:  As I understand it, the

25   adversary proceeding was not based on the existence of
```

1   the mortgage, which according to Mr. Friedman was

2   extinguished by the Naples Federal Savings and Loan

3   foreclosure action, but the adversary proceeding was

4   based on his general conduct.

5           THE COURT:  Where did the money come from?

6   In other words, the NCUA got $800,000.  Did they get

7   that because they were able to collect on some

8   mortgage?

9           MR. MEHLER:  They sold Club Regency, as I

10  understand it.

11          MR. VEBELIUNAS:  May I explain because I

12  know the details very well, your Honor.

13          THE COURT:  Okay.

14          MR. VEBELIUNAS:  Mr. Mehler was not in the

15  court.  He did not go to the bankruptcy proceeding.

16  The money came from the sale of the Club Regency, which

17  sale took place at the beginning of the bankruptcy.

18  The proceeds of the sale was about 3.3 million dollars.

19  Mr. Levitt (ph), who was a secured creditor, did

20  receive 1.3 million, leaving 2 million dollars for the

21  trustee.

22          THE COURT:  So the money came as a result of

23  the sale.

24          MR. VEBELIUNAS:  Yes, your Honor.  The

25  adversary proceeding -- the NCUA were not a secured

1   creditor at that time but they revived the mortgage and

2   that's the only reason they had standing to go for the

3   money.  Otherwise, in the bankruptcy court, if you are

4   an unsecured creditor, first you have to satisfy the

5   mortgages.  But they revived the mortgage, they changed

6   their position and they collected the money.

7            Why they agreed to $800,000, because they

8   could not prove more owing than that amount and that's

9   all in the bankruptcy court records.  I see the

10  gentleman did not bother to read it and only

11  opinionating about it.  If this is a court, I can make

12  copies of all these proceedings.

13           THE COURT:  Is it correct then that what

14  happened was the NCUA was in there because they had

15  standing as a result of the mortgage?

16           MR. MEHLER:  I don't know, Judge.  I don't

17  know the answer to that question.

18           MR. VEBELIUNAS:  I do, because in bankruptcy

19  court, you cannot -- the trustee is very jealous of

20  this money and he doesn't give any money unless you can

21  prove you are a secured creditor.  I know that Mr.

22  Mehler doesn't know it but that's the only way they

23  could have collected the money.  There was no other

24  issue and the records show that.

25           THE COURT:  If they have collected, Mr.

1   Mehler, a certain amount -- if NCUA has collected money

2   from the bankruptcy of Lidas -- that was Mr.

3   Vebeliunas's company.  If they have collected that

4   money and the money related to the Club Regency loans

5   and the restitution was specifically the Club Regency

6   loans, how can they collect it again?

7              MR. MEHLER:  How do we know what the

8   collection related to?  You say it related to Club

9   Regency.  The

10  NCUA --

11             THE COURT:  Can you enlighten the Court on

12  that because this is what Mr. Vebeliunas's position is.

13  The problem is I guess, Mr. Mehler, that I don't know.

14             MR. MEHLER:  The problem that I have had

15  throughout this, although I have made attempts to find

16  out

17  -- for example, Mr. Consenz is no longer around.  He's

18  a contract employee who came in, didn't have a lot of

19  sort of capital in this and left.  He made some

20  statement which the Court pointed to in its opinion --

21  maybe he made a mistake, maybe the situation changed.

22             The problem is that we don't know and I

23  still don't know exactly what the NCUA's claims related

24  to.  We know they generally related to Club Regency but

25  I can't say that the derelictions, the damage to the

1   NCUA that caused them to take a two-million-dollar

2   claim and settled it for $800,000 related to precisely

3   the same harms that the restitution was meant to

4   address.

5          MR. VEBELIUNAS:  Correction, Mr. Mehler.

6   The NCUA claim was only $1,250,000.

7          MR. MEHLER:  The adversary action, according

8   to Mr. Meltzer (ph), who was at the NCUA, was over two

9   million.  So if the Court wants to -- the Court says

10  we're not revisiting past history here but the

11  difficulty is that anytime you have subsequent

12  proceedings, a defendant can come in and say, wait a

13  second, this sentence that you have is not good in

14  light of what's happened.  Why didn't Mr. Vebeliunas

15  and his attorneys, at the time this settlement was

16  entered into, structure it in a way so that -- the

17  restitution was on the table.

18          He could say, look, I haven't paid my

19  restitution yet but clearly fair people would agree

20  that I shouldn't have to pay it twice.  Let's structure

21  a settlement so that this eventuality is taken care of.

22  That isn't done.  He benefits in a tactical way from

23  just entering the settlement now.  Now he comes back to

24  the Court and to us, throws all of this in our face and

25  says, you settle it.

1          My response is that you can try to be a fair

2     person but it is completely unfair for Mr. Vebeliunas

3     to twice benefit from the tactical decision to make

4     certain settlements and not have things litigated, and

5     then to come and throw a bunch of papers at us and say,

6     you get involved in this.  Mr. Mehler was not there, he

7     didn't read the file.  Why should Mr. Mehler have to

8     read the file?

9          This is a civil proceeding that took place

10    two years later and this case was indicted eight years

11    ago.  That's why I hedged my initial response.  As a

12    matter of fairness, the answer is he shouldn't have to

13    pay twice.  But there's not fairness on the other side

14    here because of what we're being asked to do, and I

15    don't think we can do it absent some incredible hearing

16    that will reveal nuances that neither of us can

17    understand with the cursory knowledge that we have.

18          MR. VEBELIUNAS:  I think if I might permit

19    to correct Mr. Mehler.  At the time of the trial in the

20    adverse proceedings, the mortgage -- I was incarcerated

21    and I could not appear, nor did I have a lawyer at that

22    time.  I had to represent myself.  I did bring into the

23    Court of Appeals -- I think I first brought this

24    discrepancy to this Court and then to Court of Appeals

25    that the restitution which was based on Club Regency

1   was first backed by good mortgage, and second, it was

2   paid because of the mortgage.  I did all I could.

3           THE COURT:  I don't know that it was, I

4   guess.  I don't know what happened.  I don't have

5   anything solid before me to know that it was paid

6   because of the mortgage.  I don't know why this is so

7   incredibly complicated to find out, though.  I guess

8   that's what I'm having a problem with.  The NCUA is the

9   person that wants the restitution of 580 -- well, to

10  them I guess $490,830.  They want that paid to them,

11  correct?

12          MR. MEHLER:  Correct.

13          THE COURT:  That's what I ordered.  You

14  don't think that they could take the time to bother to

15  enlighten the Court on whether they've already been

16  paid that amount now, when Mr. Vebeliunas makes the

17  claim that they have?

18          MR. MEHLER:  Judge, if you want, we can

19  bring Mr. Friedman in here, although from my

20  discussions with Mr. Friedman, he is in the dark on it

21  as I was.  We can bring Mr. Meltzer in here, who is the

22  associate general counsel of the NCUA, who apparently

23  is the only person still with them.  Nobody knows where

24  Mr. Consenz is.  Apparently, he's not even in the state

25  anymore.  We can bring him in and have him elucidate

1    it.

2         But it's significant and the Court may

3    recall, although it's understandable -- it's quite a

4    while ago.  But in January, when we were briefing this

5    issue, Mr. Vebeliunas relied on a couple of provisions

6    of the U.S. Code now repealed that provided for just

7    this eventuality, sort of set-offs.  When you have

8    something paid in a civil settlement, it can be set off

9    against the restitution.

10        But significantly, and the Court mentions

11   this in its opinion, all of that is going forward, as

12   you put it.  In other words, you've got a civil

13   settlement.  You come in before the judge.  The judge

14   doesn't have to relitigate a massive and complex series

15   of subsequent civil litigation.  The Court says

16   fairness dictates in the civil settlement there's this;

17   therefore, there is going to be an offset.  It was

18   repealed and one can only wonder why, although I have

19   some suspicions because of the complexities we're

20   seeing, but clearly it doesn't work in the other

21   direction and the cases are uniform in that.

22        The reason is very simple:  It can't work

23   the other way because of precisely the issue that we're

24   facing.  The Court wants to get a quick assessment of

25   what happened but there is no way, based on my

1    discussions with the people involved, to get a quick

2    assessment of what happened.

3            MR. VEBELIUNAS:  I think that the Court

4    asked very clearly, did the NCUA receive $800,000 and

5    did the $800,000 come from Club Regency?  That has been

6    proven and I think through Ms. Divine and she did

7    acknowledge receiving the $800,000.  I can show

8    documents that this money was actually from the Club

9    Regency.  I think that could almost satisfy this Court.

10           MR. McFARLAND:  A modest proposal, your

11   Honor.  I would be happy to undertake to pull out of

12   the bankruptcy files whatever refers to that

13   settlement.  That is, the adversary complaint, what was

14   the NCUA seeking and what did the settlement represent?

15   Perhaps that will enlighten us as to what was intended.

16   As I mentioned earlier, my understanding is that the

17   complaint was originally filed for claims in excess of

18   two million dollars, representing a whole host of

19   losses caused by --

20           THE COURT:  Other than for Club Regency?

21           MR. McFARLAND:  Including, but more than

22   that.  Again, I have not seen the stipulation of

23   settlement.  My experience tells me that usually those

24   things are a little vague as to --

25           THE COURT:  I have the stipulation of

1   settlement.

2              MR. McFARLAND:  That might help.

3              THE COURT:  Well, let's see.

4              (Pause in Proceedings)

5              THE COURT:  Why don't you take -- you've

6   never seen this?

7              MR. McFARLAND:  I've never it, your Honor.

8              THE COURT:  It might shed some light.  Maybe

9   you would understand it better than the Court.

10             MR. MEHLER:  That's certainly my

11  understanding as well, that the claims against Mr.

12  Vebeliunas were broad-gagued and, you know, I don't

13  think we can say that it relates, again, as I said

14  before, specifically to the harm that the restitution

15  order addresses.  Part of it might; I can't say for

16  certain.  But, again, it's a settlement.

17             I have the letter from -- another part of

18  the problem is, your Honor, I've been in Washington for

19  a year.  We've had a number of these proceedings and

20  Mr. Vebeliunas knows I'm in Washington.  Why do I have

21  to not get the papers and read them the day before.

22             THE COURT:  I'm not sure who sent that,

23  where that paper came from.

24             MR. MEHLER:  I have in a letter from Mr.

25  Meltzer, again, the individual I referred to before,

1   who seems to have -- yeah, here it is.

2           THE COURT:  Mr. McFarland, do you have

3   actually a civil action pending to collect this

4   restitution order?

5           MR. McFARLAND:  The collection is done

6   within the context of the criminal case, your Honor.

7           THE COURT:  I see.  That's the order.

8           MR. McFARLAND:  Yeah, that's the order.

9           THE COURT:  Okay.

10          MR. McFARLAND:  That's the way we do it.

11          THE COURT:  All right.

12          MR. MEHLER:  Judge, it's just a couple of

13   paragraphs.  Let me -- let me read it and then Mr.

14   Vebeliunas will hear it.  He writes to Kelly Devine

15   (ph).  I assume this was turned over and that he has

16   it, explaining that he's Alan Meltzer, Associate

17   General Counsel of the NCUA.

18          He says CASA (ph), the credit union, was

19   placed into liquidation on August 1st, 1992.  The losses

20   suffered by the NCUA as a result -- as the liquidating

21   agent of CASA were substantial.  That's losses related

22   not only to Club Regency but Beach Club, WTI, all of

23   the financial depredations that he engaged in.

24          On August 20th, 1993, Lidas International

25   filed a petition for relief under the Bankruptcy Code.

1   The relationships between CASA, Vebeliunas and Lidas

2   International are described in another document.  In

3   '95, the NCUA began an adversary proceeding against the

4   trustee.  The total amount claimed was 2.2 million

5   dollars, roughly, again for the whole ball of wax,

6   beyond Club Regency.  In April '96, a stipulation of

7   settlement was agreed to.

8             THE COURT:  Why do you say it's beyond Club

9   Regency?

10            MR. MEHLER:  Well, again, because the

11  earlier paragraph refers to the fact that the losses

12  suffered by the NCUA related to its role as the

13  liquidating agent of CASA, the fact that all of these

14  loans involving these straw borrowers impacted on the

15  NCUA.  It wasn't just Club Regency.

16            A settlement was entered into for $800,000

17  and then the final paragraph is as follows:

18            "The $800,000 was received in settlement of

19  the adversary proceeding against the trustee and not in

20  restitution for Mr. Vebeliunas.  The payment did not

21  amount to full compensation to the NCUA, as liquidating

22  agent of CASA."

23            There it is.  You can look at it, signed

24  Alan Meltzer, Associate General Counsel.

25            MR. VEBELIUNAS:  For your information, Mr.

1   Mehler and your Honor should know that this adversary

2   proceeding that was filed in 1996 is still pending in

3   the court.  And on August 19, there will be a status

4   conference before Bankruptcy Judge Buchanan (ph).  So

5   whatever they're claiming, it's still outstanding.

6   This settlement, $800,000, was only brought in by that

7   procedure on the money that was from Club Regency.  The

8   balance of the money is still being negotiated.

9         So to answer your Honor's question, the

10   money came from Club Regency.  It was paid because they

11   produced the affidavits, they had the mortgage.  I had

12   no way of -- there was no stipulation at that time

13   because I was six years out of CASA and I had no way to

14   know what mortgages are good or not, so we had to take

15   the word.

16         THE COURT:  But, Mr. Vebeliunas, there are a

17   couple of things here, one of which is that the

18   $90,000, by your own admission, had nothing to do with

19   this proceeding.

20         MR. VEBELIUNAS:  That I understand, yes.

21         THE COURT:  So the $90,000, you can't

22   contest as a part of your restitution order.

23         MR. VEBELIUNAS:  I'm talking about Club

24   Regency losses now.

25         THE COURT:  So that $90,000 that the Court

1    ordered in restitution is not the subject of any of the

2    arguments you're making in connection with this

3    bankruptcy, correct?

4              MR. VEBELIUNAS:  I understand.

5              THE COURT:  So that money is not the subject

6    of dispute.  And I think $124,000 of that amount was

7    paid to the insurance company that insured, I don't

8    know, the NCUA?

9              Who was Cumus (ph)?  Do you remember, Mr. --

10             MR. VEBELIUNAS:  Your Honor, if they paid

11   for the insurance company, that means -- I don't know

12   if they did but that means that the insurance company

13   paid them before and they just had to reimburse (ui).

14             THE COURT:  I don't know.

15             Mr. McFarland, have you had the opportunity

16   to --

17             MR. McFARLAND:  I did.  It's not 100% clear

18   here, your Honor, what was intended.  Perhaps I should

19   consult with the NCUA and discuss it with them because

20   I myself spoke with Mr. Meltzer yesterday, in

21   anticipation of coming in today.  He actually told me

22   that he didn't have a copy of the stipulation himself,

23   so perhaps I can send that along to him and we can

24   discuss this and see what the NCUA -- what its position

25   is.

```
 1            THE COURT:  I don't think it's an irrational
 2   thing to do right now.  Looking at the record and
 3   particularly reading that settlement agreement would
 4   suggest perhaps that the settlement that was reached
 5   related to the Club Regency.
 6            MR. McFARLAND:  I think that's fair to say,
 7   your Honor.
 8            THE COURT:  I don't think that the
 9   government can have recovery twice.  I mean, I think as
10   a matter of fairness, the government doesn't have
11   recovery twice.  And I'd like to --
12            MR. McFARLAND:  Usually, we're lucky if we
13   get it once.
14            THE COURT:  Yeah, exactly.  I mean, the
15   money you get out of this proceeding will be
16   questionable, I guess.  But it seems like to me that --
17   and I'm just talking now in terms of the provisions,
18   continuing provisions for supervised release and what
19   ought to be paid and all this.
20            This doesn't in my mind -- again, I have to
21   say this is all subsequent proceedings.  It has nothing
22   to do with the validity of the sentence as imposed or
23   the validity of the continuing supervised release.
24            It seems like to me that the $90,000 is not
25   the subject of any dispute on Mr. Vebeliunas' behalf.
```

1    I think that perhaps we ought to determine what the

2    $124,000 is to the insurance company.  That was awarded

3    to Cumus Mutual Insurance Company.  I don't know

4    whether they get paid back or not from this 800.

5            MR. McFARLAND:  That would be something that

6    I would inquire about, your Honor.

7            THE COURT:  Yeah.  So those are the things

8    that I really want to know, in fairness, the answer to.

9    I mean, there may be a way where, assuming this has all

10   been paid, this particular part of the restitution --

11           MR. McFARLAND:  My understanding is that the

12   $800,000 has been paid, your Honor.

13           THE COURT:  Has been paid.

14           MR. McFARLAND:  I would be surprised if it

15   had not been paid.

16           THE COURT:  Yeah, but the question is, does

17   that cover this particular -- the restitution order was

18   specific, and I could only order restitution on the

19   counts of conviction, so that was a specific amount

20   related to specific counts.  This wasn't, you know, an

21   overall compromise saying, for instance, well, you owe

22   this -- that is the amount of restitution that was

23   paid.

24           If it's been paid by somebody else, it seems

25   like maybe ultimately, that down the road would be a

1  collection issue, but why not just -- let's deal with

2  that now as it pertains, for instance, to continuing

3  payments.

4          But any way you look at it, Mr. Vebeliunas,

5  you owe the government a lot of money.  You owe

6  $90,000.  There may well be no issue about the

7  $124,000.  I don't know.  Plus, there's a $60,000 fine.

8  So the payments that the probation officer is

9  recommending are certainly not substantial, in light of

10  that undisputed financial obligation that you have.

11          But in fairness, if we can resolve this

12  other thing, I we ought to do it.  And I don't think

13  the answer is quite as complicated or may not be as

14  complicated as Mr. Mehler suggested.

15          MR. VEBELIUNAS:  How can I be advised about

16  the Social Security pension?  The gentleman agreed that

17  this is not subject to --

18          THE COURT:  There's a difference, Mr.

19  Vebeliunas, it seems to me, between going after that

20  money.  In other words, the government is saying they

21  can't go after your Social Security versus counting it.

22  I mean, it's clearly --

23          MR. VEBELIUNAS:  The probation officer comes

24  and says, you paid the --

25          THE COURT:  Do you have a case that says

1    that they can't include restitution?

2              MR. VEBELIUNAS:  No, I don't.

3              THE COURT:  Well, I can't imagine why they

4    can't but, you know --

5              MR. McFARLAND:  It's just an economic

6    determination, your Honor.

7              THE COURT:  Yeah.  It's a determination of

8    the amount of money that you have to work with.  What

9    the government is saying is that if you don't pay, they

10   can't then attach your Social Security income and take

11   your Social Security income.  But they can certainly

12   consider it in terms of the finances that you have in

13   order to make your payments.

14             There's no reason, rational reason that I

15   can think of that it wouldn't be included among your

16   income to determine what your financial picture was.  I

17   can't imagine why it wouldn't be included.

18             MR. VEBELIUNAS:  Your Honor --

19             THE COURT:  If you have some case that says

20   that the government can't consider that in terms of

21   what your financial picture is, then I'd be happy to

22   consider it.

23             MR. VEBELIUNAS:  Your Honor, but this is

24   like (ui) attachment.  The probation officer says, if

25   you don't pay the $500, you're not getting any travel

1    permits.  So I have to pay.  It's the factor --

2         THE COURT:  It has nothing to do with

3    anything.  What she's saying is, and appropriately so,

4    that if you've got money to spend on travel, you've got

5    money to pay your fine and you've got money to pay your

6    financial obligation.

7         MR. VEBELIUNAS:  Your Honor, the travel is

8    purely business.  If I don't travel, I don't make any

9    money, so the government cannot get money.  That's why

10   I was asking you if you could, at this juncture, to

11   lift at least the travel restrictions.  And at the

12   same --

13        THE COURT:  I'm not going to do anything

14   like that without the probation officer here.  I did

15   not -- I didn't understand you to be contesting -- is

16   there some paper where you asked previously to be

17   lifted of this restitution?  Maybe I don't have it.

18        MR. VEBELIUNAS:  At the same breath, I want

19   to thank your Honor for so expediting my trip to

20   Lithuania when my brother died, but that didn't happen

21   again because the probation officer -- there was a man

22   says, no way, you cannot travel.  So I wrote to you and

23   of course, the permission came too late for the funeral

24   but --

25        THE COURT:  I faxed it to you from the

1   office.   I was here on Saturday.   I faxed it to your

2   home.

3                   MR. VEBELIUNAS:   Yes, but I was at home.   I

4   thank you for your prompt action but you see, like the

5   travel restriction produces absolutely nothing --

6                   THE COURT:   You can always go to the

7   probation officer and ask, you know, on a personal

8   issue or something.   If you have some problem with the

9   travel restriction -- but I understand the nature of

10   the travel restriction.

11                   Mr. McFarland, if you can find out the

12   information with respect to that, I think that would

13   take us a little way towards resolving this.   And maybe

14   you can, based on your determinations, reach some

15   resolution independently.

16                   The bottom line, Mr. Vebeliunas, is you owe

17   a tremendous amount of money.

18                   MR. VEBELIUNAS:   But we're talking about

19   Club Regency at this point.

20                   THE COURT:   No, there's the WTI loan.

21   That's $90,000 that has nothing to do with Club

22   Regency.   There's your fine.   That's $60,000 that has

23   nothing to do with Club Regency.   The only thing that

24   we're talking about here in terms of the government's

25   enforcement obligations, in terms of the continuing

1    provisions of supervised release, you know, on how much

2    money you need to pay and what's calculated in

3    connection with that seems to me to be whether this is

4    still money that has to be paid from the government's

5    perspective or whether it's in effect been paid.

6              Mr. McFarland, maybe you can look into that.

7              MR. McFARLAND:  That's what I will do, your

8    Honor.

9              MR. VEBELIUNAS:  Your Honor, if you direct

10   the gentleman to copy me on that, so I can respond to

11   their search.

12             THE COURT:  They will copy -- anything

13   that's presented to the Court --

14             MR. McFARLAND:  Anything that I submit to

15   the Court, your Honor --

16             THE COURT:  -- they will copy --

17             MR. McFARLAND:  -- of course I will provide

18   to the defendant.

19             THE COURT:  -- to me.

20             MR. McFARLAND:  May I make a copy of this,

21   your Honor?

22             THE COURT:  Sure.  I actually don't know.

23             Did you provide that to the Court?  I don't

24   remember how that -- the settlement agreement?

25             MR. VEBELIUNAS:  I don't remember, your

1  Honor.

2          THE COURT:  It must have been in a file

3  somewhere.  I don't know who provided it.

4          MR. McFARLAND:  The facts --

5          MR. MEHLER:  I think we have it, Judge.  I

6  have a copy from Mr. Friedman.  He sent it to me.

7          THE COURT:  Do you have a copy of it?

8          MR. VEBELIUNAS:  I think in the files, I

9  must have a copy.

10          THE COURT:  All right, then why don't you

11  respond -- when do you think --

12          MR. McFARLAND:  If I could have thirty days,

13  your Honor, just in case I have to go to the archives

14  in bankruptcy court over in Manhattan.

15          THE COURT:  Okay.

16          MR. McFARLAND:  If I can do it more quickly,

17  your Honor, I'll be happy to.

18          THE COURT:  If you want an opportunity to

19  respond to his papers on this issue, you can do that.

20  Do you want to do that two weeks after you get his --

21          MR. VEBELIUNAS:  How many days do I have?

22  Can I have at least fifteen days or thirty days to

23  respond?

24          THE COURT:  Yeah.  Why don't you -- you can

25  have two weeks afterwards, fifteen days, whatever you

1    want to respond.  And I'll take a look at the papers

2    and see if there's any basis to alter any conditions of

3    supervised release, which is the way I'm looking at

4    this, okay?  And if I think we need to have a further

5    hearing to discuss any of this, we'll do it.

6              You know, Mr. McFarland, there may be some

7    resolution you can reach on this.

8              MR. McFARLAND:  I understand that, your

9    Honor.

10             THE COURT:  Particularly when we consider

11   the viability of getting this money, okay?  All right,

12   thank you.

13                 * * * * * * * * *

14

15

16

17

18

19

20

21

22

23

24

25

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

ELIZABETH BARRON                    November 26, 2012